WINNEMUCCA PARTNERS, JOHN E. HAYES, TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Winnemucca Partners v. Commissioner
Docket Nos. 25977-86, 11692-87
United States Tax Court
T.C. Memo 1995-217; 1995 Tax Ct. Memo LEXIS 219; 69 T.C.M. (CCH) 2630; May 18, 1995, Filed *219 An appropriate order and decision will be entered in each docket granting respondent's motion for summary judgment. John E. Hayes, pro se. For respondent: Patricia Anne Golembiewski. DAWSON; ARMEN
DAWSON; ARMEN
MEMORANDUM OPINION DAWSON, Judge: These consolidated cases were assigned to Special Trial Judge Robert N. Armen, Jr., pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the Opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE ARMEN, Special Trial Judge: This matter is before the Court on respondent's Motion for Summary Judgment, filed pursuant to Rule 121. The issue for decision is whether respondent is entitled to a summary adjudication in her favor that Winnemucca Partners is not entitled *220 to deductions for mine development expenditures under section 616(a) for the taxable years 1982 through 1984. Based on the record in these two consolidated cases, including the parties' Stipulation of Facts and respondent's Third Request for Admissions, and as explained in more detail below, we conclude that respondent is entitled to the relief that she seeks. Background[2]
At all relevant times, the principal place of business of Winnemucca Partners was in Atlanta, Georgia. See sec. 7482(b)(1)(E). During the taxable years 1982 through *221 1984, the principal residence of petitioner John E. Hayes was also in Atlanta, Georgia. Winnemucca Partners (Winnemucca or the partnership) was a limited partnership subject to the partnership procedures enacted by the Congress in the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 402(a), 96 Stat. 648-667, and set forth in sections 6221 through 6233. Petitioner John E. Hayes (petitioner or Hayes) was the general partner, as well as the tax matters partner (TMP), of Winnemucca. J. Hayes & Associates, Inc. (Hayes & Associates) was a business venture undertaken by Hayes and through which Hayes promoted and sold investments in promotions such as the mining venture involved herein. [3]
Winnemucca was formed in Atlanta, Georgia, on or about December 10, 1982. The partnership's sole *222 business activity during the taxable years 1982 through 1984 was "the purported mining of silver and gold ore" through the mining venture described below. [4]
By a prospectus dated September 1, 1982 (the prospectus), Hayes, acting through Hayes & Associates, promoted a gold and silver mining venture (the Hayes mining venture). The prospectus represented that investors could claim deductions for mining development expenditures under section 616(a). The prospectus also promised, inter alia, "a 5 to 1 tax write off against income". Prior to the time that the prospectus for the Hayes mining venture was issued, Hayes was not involved in any way in the sale of minerals or the mining and extraction of minerals, nor was he experienced in any aspect of mining in the manner contemplated by the prospectus. Through the prospectus for the Hayes mining venture, Hayes offered investors the opportunity to purchase from the AuR Company, Inc. (AuR [5]) mineral aggregate [6] from a parcel of real property, *223 known as the Rose-Dale Property, that was located 10 miles southwest of Winnemucca, Nevada, in Pershing County, Nevada. The prospectus contemplated that investors would also enter into a contract with Mineral Associates, Inc. (MAI) for MAI to perform mining services in respect of the mineral aggregate purchased from AuR. The Rose-Dale Property was divided into 2,600 lots. Each lot of mineral aggregate measured a single yard in depth by 500 yards in length by 8 yards in width. Accordingly, each lot consisted of 4,000 cubic yards (i.e., 1 yd x 500 yds x 8 yds). An isometric drawing of the lotting of the Rose-Dale Property appears on the following page: Isometric View Of Lotting No Scale Real property situated in Pershing County, *224 Nevada described as the following; Lots 1 and 2 of the Northwest quarter; the South half of the Northeast quarter; on the Southeast quarter of Section 5, Township 34 North, Range 37 East, M.D.B. and M. As the foregoing drawing illustrates, there were 100 lots on the surface of the Rose-Dale Property. The surface lots were designated as Lot 1A through Lot 100A. There were also 26 horizontal layers of lots. The horizontal layers were each 1 yard in depth and were designated alphabetically from A to Z. The layer designated A was the layer on the surface, the layer designated B was the next lower layer, and the layer designated Z was the lowest layer. The prospectus for the Hayes mining venture contemplated that investors would acquire mineral aggregate by entering into an agreement (entitled "Sale of Mineral Aggregate Subject to Royalty Agreement") with AuR for the purchase of lots in the Rose-Dale Property at a cost of $ 350 per lot. [7] A sample of the sales agreement was incorporated in the prospectus. *225 The prospectus for the Hayes mining venture also contemplated that investors would enter into an agreement (entitled "Agreement to Perform Mining Services") with MAI for mining services at a cost of $ 12.50 per cubic yard, or $ 50,000 per lot of mineral aggregate (i.e., $ 12.50/yd<3> x 4,000yd<3>/lot). Twenty percent (or $ 10,000) of this amount was payable in cash. The balance (or $ 40,000) was payable, with interest, pursuant to a promissory note. Samples of the mining agreement and the promissory note were also incorporated in the prospectus. The Hayes mining prospectus stated that, with respect to the development of the lots on the Rose-Dale Property, the "results of such development will be determined solely by reference to the Taxpayer's specific mineral aggregate and there will be no pooling of interests (whether income or expense items) with other prospective purchasers." Mining the lots that comprised the Rose-Dale Property under such circumstances would have been economically and commercially infeasible. On December 20, 1982, Hayes, acting in his capacity as Winnemucca's general partner, entered into an agreement with AuR for the purchase of 14 lots of mineral aggregate *226 on the Rose-Dale Property (the 14 lots) for $ 350 each, for a total cost of $ 4,900. Specifically, Winnemucca acquired Lots A-14 through A-17, A-41, A-98 through A-100, and B-35 through B-40. The document embodying the agreement was identical to the sample sales agreement that was incorporated in the prospectus for the Hayes mining venture. Also on December 20, 1982, Hayes, again acting in his capacity as Winnemucca's general partner, entered into an agreement with MAI to perform mining services in respect of the 14 lots on the Rose-Dale Property at the rate of $ 12.50 per cubic yard of mineral aggregate. [8] Pursuant to the terms of the agreement, Winnemucca agreed to pay $ 140,000 in cash and the balance pursuant to a promissory note. The total amount payable was therefore $ 700,000 (i.e., $ 12.50/yd<3> x 4,000 yd<3>/lot x 14 lots). Therefore, the balance to be paid pursuant to the promissory note was $ 560,000. The document embodying the agreement was identical to the sample mining agreement that was incorporated in the prospectus for the Hayes mining venture. *227 Finally, on December 20, 1982, Hayes, once again acting in his capacity as Winnemucca's general partner, executed a promissory note in favor of MAI for a principal amount of $ 560,000. The promissory note was identical to the sample promissory note that was incorporated in the prospectus for the Hayes mining venture, except that it was altered to provide that "All interest deferred until completion of all mining". No payments of either principal or interest have been made pursuant to the promissory note. At no time since Winnemucca purchased the mineral aggregate on the Rose-Dale Property has any gold or silver been extracted from any of Winnemucca's 14 lots. Similarly, since that time, no gold or silver from such lots has been sold by or on behalf of Winnemucca. At no time has any gold or silver in commercially marketable quantities been disclosed in any of Winnemucca's 14 lots of mineral aggregate on the Rose-Dale Property. At no time have there been mining development activities in respect of any of Winnemucca's 14 lots on the Rose-Dale Property. Winnemucca filed its partnership returns (Forms 1065) on a calendar year basis. Its return for 1982 covered the period from *228 December 10, 1982 [9] through December 31, 1982, and was executed by Hayes. On that return, Winnemucca reported no income and claimed an ordinary loss in the amount of $ 700,000. The loss was based on a single deduction in the amount of $ 700,000 for mining development costs. Winnemucca then allocated $ 560,000 of the loss to Hayes as general partner and the remaining $ 140,000 of the loss to 11 limited partners. Winnemucca's partnership return for 1983 was also executed by Hayes. On that return, Winnemucca reported no income and claimed an ordinary loss in the amount of $ 240,000. The loss was based on a'single deduction in the amount of $ 240,000 for mining development costs. Winnemucca then allocated $ 170,000 of the loss to Hayes as general partner and the remaining $ 70,000 of the loss -to 4 limited partners. Winnemucca's partnership return for 1984 was also executed by Hayes. On that return, Winnemucca reported no income and *229 claimed an ordinary loss in the amount of $ 60,000. The loss was based on a single deduction in the amount of $ 60,000 for mining development costs. Winnemucca then allocated $ 50,000 of the loss to Hayes as general partner and the remaining $ 10,000 of the loss to 1 limited partner. On April 3, 1986, respondent issued a Notice of Final Partnership Administrative Adjustment (FPAA) to petitioner in respect of Winnemucca's 1982 taxable year (i.e., the period from December 10, 1982 through December 31, 1982). In the FPAA, respondent disallowed in its entirety the $ 700,000 deduction claimed by Winnemucca for mining development costs on its 1982 partnership return. Respondent disallowed the deduction for a variety of reasons, including the partnership's failure to establish: (1) The amount claimed was paid or incurred after the existence of ores or minerals in commercially marketable quantities had been disclosed, as required by section 616(a); and (2) the claimed expense was paid for the purpose of, or reasonably connected with, preparation for extracting ores or minerals. Essentially, respondent determined that no mine development activities had occurred. On April 13, 1987, respondent *230 issued an FPAA to petitioner in respect of Winnemucca's 1983 and 1984 taxable years. In the FPAA, respondent disallowed in their entirety the $ 240,000 and $ 60,000 deductions claimed by Winnemucca for mining development costs on its partnership returns for 1983 and 1984, respectively. Respondent disallowed the deductions for a variety of reasons, including the two reasons set forth in the previous paragraph above. Discussion
Under Rule 121, a summary adjudication may be made "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may rendered as a matter of law." Rule 121(b). The moving party, here respondent, bears the burden of proving that there is no genuine issue of material fact in dispute. E.g., . Moreover, respondent, as the moving party, must also prove that she is entitled to prevail on the substantive issue as a matter of law. Rule 121(b). The party opposing the motion, here petitioner, may not simply rest upon *231 the allegations or denials in his or her pleadings, but rather must "set forth specific facts showing that there is a genuine issue for trial." Rule 121(d); , affg. per curiam ; . In considering whether summary judgment is appropriate, the Court views the facts in the light most favorable to the party opposing the motion for summary judgment. ; see . To demonstrate the absence of material facts in dispute, respondent relies heavily on the stipulation of facts entered into by the parties. Respondent also relies heavily on the stipulation of facts entered into by the parties. Respondent also relies heavily on facts deemed admitted (sometimes referred to hereafter as the deemed admissions) because of petitioner's failure to respond to respondent's Third Request for Admissions (the Third Request). [10]
*232 Respondent also relies on the Court's Order dated September 2, 1992, issued pursuant to Rule 104(c), which precludes petitioner "from introducing as evidence at trial any of the documents and materials, or testimony about said documents and materials, which respondent requested in the Second Request for Production of Documents served on May 8, 1989 and which are described in paragraphs 1 through 41, 45 and 46 of Respondent's Second Request for Production of Documents served on petitioners on May 8, 1989." Among the items requested but not produced were "Any and all evidence of commercially marketable quantities of gold and/or silver in the parcel of mineral aggregate of the Rose-Dale Property the [partnership] purportedly purchased from [AuR]." Section 616(a) provides, in relevant part, as follows: there shall be allowed as a deduction in computing taxable income all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit (other than an oil or gas well) if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed. Therefore, in order for respondent to prevail on her motion *233 for summary judgment for each of the years in issue, she must demonstrate that either: (1) At no time before the 1985 taxable year was the existence of ores or minerals in commercially marketable qualities disclosed on the Rose-Dale Property; or that (2) at no time during any of the years in issue did petitioner incur expenses for the development of a mine or other natural deposit (other than an oil or gas well). On brief, petitioner acknowledges that no actual mining occurred on any of the 14 lots during the years in issue. Petitioner essentially advances two reasons why the Court should deny respondent's motion: First, because a dispute exists as to material facts, namely, whether commercially marketable quantities of gold existed on the Rose-Dale Property and whether petitioner incurred development expenses within the meaning of section 616; and second, because respondent has too narrowly construed the term "development" as used in section 616. To support the first contention, petitioner relies on certain responses to interrogatories propounded by respondent in which petitioner described what purportedly occurred on the Rose-Dale Property in 1983. However, as we have already *234 stated, a party may not simply rest upon the allegations or denials in his or her pleadings to oppose a motion for summary judgment. Rule 121(d). Petitioner's unsupported responses to respondent's interrogatories are tantamount to the allegations or denials in a party's pleadings. Petitioner's unsupported responses are simply insufficient to counter the evidence provided by respondent in support of her motion, particularly in light of the fact that respondent's evidence includes stipulated facts, as well as deemed admissions. In any event, the record in these cases supports a finding, and we have so found, that at no time has any gold or silver in commercially marketable quantities been disclosed in any of Winnemucca's 14 lots of mineral aggregate on the Rose-Dale Property. Moreover, the record in these cases supports a finding, and we have so found, that mining the 14 lots under the conditions set forth in the prospectus for the Hayes mining venture would have been economically and commercially infeasible. [11] In view of the foregoing, and based upon the record in these cases, we conclude that no genuine dispute as to any material fact exists. As the Court stated in , *235 summary judgment is a mechanism specifically intended to expedite litigation and to avoid unnecessary and expensive trials of phantom factual issues.
Petitioner's second contention is essentially directed at respondent's interpretation of the law. The existence of a dispute as to a matter of law is not a viable reason for the Court to decline to summarily adjudicate a case, but rather a basis upon which to so adjudicate, where there is no genuine dispute as to material facts. As noted above, petitioner contends that respondent interprets the term "development" too narrowly for purposes of section *236 616. Specifically, on brief, petitioner argues that "it is not necessary that the development expenditures incurred be right on the taxpayer's property in order to qualify for the section 616 deduction." In , the term "development" was defined to mean: those expenditures designed to prepare a mineral deposit for extraction or exploitation and includes those expenses * * * [required] to make a mineral deposit accessible for mining, such as stripping the overburden and constructing means for its removal in the case of open pit mining, or sinking shafts and installing raises, tracks, or pumps in the case of underground mining. [See also , affd. (expenditures incurred in acquiring a right of access to a mine did not constitute mine development expenses but rather capital expenditures)]. The parties have stipulated that at no time have there been mining development activities on the partnership's 14 lots of mineral aggregate on the *237 Rose-Dale Property. Moreover, petitioner is deemed to have admitted, inter alia: that "At no time from January 1, 1982 to the present time has there been mining development on the Rose-Dale property." The foregoing stipulation and admission are bolstered by two affidavits that petitioner attached to his original response objecting to respondent's motion for summary judgment. The first affidavit was executed by Ronald Wilson, the same individual who entered into the mining services agreement on behalf of MAI with Winnemucca in December 1982. The affidavit provides in pertinent part as follows: I was the Treasurer of Mineral Associates, Inc., for the years 1982, 1983, and 1984. * * * I am personally aware of 14 mining units which belonged to a partnership by the name of Winnemucca Partners. These 14 units were treated by Mineral Associates, Inc., in the same manner in which Mineral Associates, Inc., treated all of the units located at the mining operation in Winnemucca, Nevada. The mining units of Mineral Associates, Inc., located in Winnemucca, Nevada, were to be mined in a pre-planned manner. The 14 units owned by Winnemucca Partners were not mined due to Mineral Associates, *238 Inc., being forced into bankruptcy before that time in which said units could be reached by the mining apparatus in accordance with said plan. The second affidavit was executed by petitioner himself. The affidavit provides in pertinent part as follows: Winnemucca Partners owned 14 mining units at the mining site located in Winnemucca, Nevada, and employed the services of Mineral Associates, Inc., to mine said units. These mining units were located in different areas, both horizontally and vertically, of the grid system established by Mineral Associates, Inc., and, as such, the mining operations of Mineral Associates, Inc., would reach each of said units at different times depending upon a pre-planned schedule of Mineral Associates, Inc. * * * Mineral Associates, Inc., was forced into bankruptcy before that time in which said units of Winnemucca Partners could be reached by its mining apparatus in accordance with its plan. We find nothing to indicate that the parties, in stipulating to the lack of mining development activities on the partnership's 14 lots on the Rose-Dale Property, intended the term "development", as used in the stipulation, to have a meaning different from *239 what it has in section 616. Based on the parties' stipulations and the deemed admissions, as well as the balance of the record before us, we conclude that no development activities, within the meaning of section 616, occurred in respect of any of Winnemucca's 14 lots of mineral aggregate on the Rose-Dale property during the years in issue. Furthermore, in view of our finding that no gold or silver in commercially marketable quantities has been disclosed in any of said lots, it is apparent that neither requirement of section 616 has been satisfied. Conclusion
Petitioner is not entitled to any deduction under section 616(a) for any of the years in issue because no expenditures were incurred for the development of the Rose-Dale Property after the existence of ores or minerals in commercially marketable quantities had been disclosed. Accordingly, respondent is entitled to summary judgment as a matter of law. In order to give effect to our conclusion, An appropriate order and decision will be entered in each docket granting respondent's motion for summary judgment. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. In considering whether summary judgment is appropriate, the Court views the facts in the light most favorable to the party opposing the motion. ; see . Accordingly, because it is respondent's Motion for Summary Judgment that is before the Court, we view the facts in the light most favorable to petitioner.↩
3. See , for the resolution of an issue concerning Hayes' involvement in certain commodities tax shelters that were found to be shams.↩
4. So stipulated by the parties.↩
5. Pronounced "ore".↩
6. The record discloses that the term "mineral aggregate" has no generally recognized meaning in the mining industry but rather is a term coined by Hayes for use in promoting the Hayes mining venture. Nevertheless, we use the term throughout this Opinion.↩
7. The cost of each lot was based on a price of $ 0.0875 per cubic yard of mineral aggregate. Because the volume of each lot consisted of 4,000 cubic yards (i.e., 1 yd x 500 yds x 8 yds), the price per lot was $ 0.0875/yd<3> x 4,000yd<3>, or $ 350.↩
8. The agreement was executed on behalf of MAI by its treasurer, R. M. Wilson.↩
9. It will be recalled that Winnemucca was formed on or about December 10, 1982.↩
10. Under Rule 90(c), a party's failure to respond to a request for admissions automatically results in the admission of each matter set forth in the request. ; , affd. . On brief, petitioner objects to respondent's reliance on facts deemed admitted in respondent's Third Request for Admissions, which was filed with the Court and served on petitioner in June 1992. The ground for objection is that petitioner had already, through counsel and in a joint response together with a number of other taxpayers in consolidated cases, denied certain of the same matters in respondent's Second Request for Admissions, which had been filed with the Court and served on petitioner in May 1989. We find petitioner's objection to be without merit. At no time during the nearly 3 years since respondent served her Third Request for Admissions has petitioner either: (1) Filed a response to the Third Request under Rule 90(c); (2) filed a motion to withdraw or modify any admission under Rule 90(f); or (3) filed a motion for a protective order under Rule 103. Therefore, those matters deemed admitted under Rule 90(c) remain conclusively established under Rule 90(f). Moreover, if petitioner's objection on brief to respondent's reliance on the Third Request were viewed as a motion to withdraw or modify the deemed admissions, we would not grant such a motion because such action would be unduly prejudicial to respondent. See . In a Trial Memorandum filed with the Court on Dec. 8, 1992, and served on petitioner on Nov. 13, 1992, respondent provided a summary of the facts in this case and then noted as follows: This Statement of Facts is simply a brief summary of the facts underlying these cases. At trial and in post-trial briefs, respondent will rely on facts set forth in Respondent's Third Request for Admissions served on petitioner on June 22, 1992. The facts stated there are deemed admitted pursuant to T.C. Rule 90(c) because the partnership failed to reply in any manner to the requests for admissions. On a number of occasions since Nov. 13, 1992, respondent has unequivocally reiterated her position that she regards the facts set forth in the Third Request for Admissions as conclusively established and that she intends to rely on them. Nevertheless, as indicated above, petitioner has taken no appropriate action to modify the deemed admissions or have them withdrawn. Finally, we think respondent was justified in serving her Third Request for Admissions, notwithstanding the fact that petitioner had already denied certain of the same matters in respondent's Second Request for Admissions. Given the context within which the responses were made, the arguable lack of good faith apparent in certain responses, the subsequent withdrawal of petitioner's counsel, and the passage of 3 full years with little, if any, progress having been made towards resolving these cases, we can understand why respondent again turned to Rule 90. We are simply unable to accept petitioner's assertion that the Third Request "was just a ploy by the respondent to trap an unwary pro se↩ party after counsel withdrew." After all, as promoter of the Hayes mining venture and Winnemucca's general partner and TMP, petitioner was uniquely qualified to respond to respondent's Third Request. Further, petitioner is simply not as unsophisticated in the law as he would have this Court believe, and we regard his assertion as disingenuous.
11. The foregoing finding is based on the record in these cases. Nevertheless, we take this opportunity to again observe that petitioner failed to produce and, as a result of that failure, was barred by the Court from producing "Any and all evidence of commercially marketable quantities of gold and/or silver in the parcel of mineral aggregate of the Rose-Dale Property the [partnership] purportedly purchased from [AuR]."↩